Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. All right, I want to welcome everyone to this December Zoom sitting of our court. Thank the attorneys for their cooperation with the remote arguments and all the technological arrangements that required. Before we get into the first case, I wanted to note this is a sad day for the Fifth Circuit. One of the true giants of our court, Judge Tom Reveley, passed away last night. He had an unparalleled record of judicial service to this country over 50 years, including over 30 years on our court, also a long tenure on Judge Willett's former court, the Supreme Court of Texas, and initially in the 60s serving as a trial judge in Austin. And that 50 years of judicial service was not Judge Reveley's greatest contribution to the United States. He served in World War II and the war against fascism in the Navy. He was on the destroyer. It was part of the escort when President Roosevelt traveled to Yalta for that historic conference. So he was just a legend of our court who will be truly missed. One of the things he tried to teach younger judges like me was to be efficient and to move the cases along. So in that spirit, we will turn to this first case, United States v. Warren, and first hear from Mr. Newton. May it please the court. I'm Brent Newton. I represent Co-Appellate Martinez. This afternoon, I'd like to address the three issues discussed in Mr. Martinez's reply brief. First, whether there was a fatal variance between count one of the superseding indictment charging a conspiracy, the prosecution's proof of that conspiracy at trial. Second, whether there was insufficient evidence of the seven aiding and abetting substantive counts of mail fraud and wire fraud and counts two through eight of the superseding indictment. And then third, whether it's sentencing the district court misinterpreted 18 U.S.C. Section 2326 as requiring a mandatory minimum prison sentence to be imposed consecutively to the guidelines prison sentence that was imposed for the eight counts of conviction. Before I address those three issues, however, I would first like to briefly address a dispute between Mr. Martinez and the government in our briefs concerning the government's evidence of Mr. Martinez's alleged role in Mr. Mendez's conspiracy, the first of the two conspiracies that we contend were alleged in a single count. At trial, the government's star Rick Mendez, who was the ringleader of the big telemarketing fraud scheme, testified that Mr. Martinez did not become criminally involved in his conspiracy until around March of 2010 when Mr. Martinez, angry about a financial matter, tried to lock out Mr. Mendez. At that point, they reached an agreement that Mr. Martinez, according to Mendez, that Mr. and did so for three or four months before they split. Mr. Martinez, according to Mendez, merely did him a favor a year before in lending his name and his good credit to enable Mendez, who was in bankruptcy, to be able to get a telemarketing bond, a business bank account, and a credit card merchant account, but that Martinez played no other role at that point. And remember, the evidence showed Mr. Mendez began with a legitimate telemarketing operation. It did not turn fraudulent until mid-2009 when some of his telemarketers started pitching heat, as they referred to it. So it was not until, quote, sometime in 2010, end of quote, according to Mendez, that Mr. Martinez became criminally involved. Now, despite this testimony, the government contends that Mr. Martinez knowingly joined the criminal operation that Mendez led much earlier in the fall of 2009. The government bases this assertion primarily on the testimony of Max Chilson. And if you look at page 10 of the government's brief, it cites record on appeal, page 1398 through 1400. But if you look at those pages carefully, you're going to see Chilson was referring to his role with Mr. Martinez later in 2010. In fact, Mr. Chilson did not even join Mendez's operation by his own testimony, and it is admitted in the government's brief, until January 2010. So Mr. Chilson could not be the one to provide information about when Mr. Martinez played any role with Mr. Mendez. Mr. Mendez's testimony is probative of that. Now I'll address the variance issue. Mendez's testimony, when considered together with four prosecution witnesses who testified about the second alleged conspiracy, the one involving Mr. Martinez's separate company, Resorts Management Services, or RMS, it clearly shows there were two alleged conspiracies. The first conspiracy was the one led by Mendez, which primarily used the company name Resorts Condos Management, or RCM, and a successor business named Timeshare Goldline. The second alleged conspiracy concerned Mr. Martinez's company, RMS. Although the prosecution witnesses testified that the two telemarketing operations used similar methods, and they had some overlapping employees, but in succession, not concurrently, that these were two completely different conspiracies for both variance, kodiakus variance purposes, and, as I point out in the reply brief, for double jeopardy purposes. These were not mutually dependent conspiracies. These were competitors. They were two distinct conspiracies, and that was not how it was charged in count one of the indictment. And for that reason, there's a variance. A variance is... You acknowledge there's some overlap in the participants. It's the same modus operandi or scheme. I understand they're different companies. The money is going to different people. You say they're competitors. But, I mean, at most, isn't it just arguable whether there were one or two conspiracies, in which case we'd have to defer to the jury's determination that there was a single conspiracy as charged? I don't think so, your honor. If you were... If you parse the evidence very carefully, you're going to see there was a break in mid-2010. At that point, men... And this is the language the government uses in its brief. They split. Mendez and Martinez split. They were competitors. They were competing against each other. The most important element for purposes of deciding whether there's one or two conspiracies is whether they were mutually dependent or supportive. They were... To the contrary, they were competitors. These were two distinct conspiracies. Well, even if there were two distinct conspiracies, wasn't the evidence such that the jury could have reasonably found that your client was a member of both? Well, the jury may have been able to have found that he was a variant. The problem is, a variance analysis requires the court to not simply decide whether a rational jury could have convicted him of one or both of the conspiracies that were mushed together. Rather, this court's president, President Nkotiakis, in fact, requires this court to analyze the issue according to traditional joiner and severance principles. So in addition to whether he is... A rational jury could have convicted him of one or both of the conspiracies. The court has to ask whether there would be a reversible error. And of course, this is all hypothetical because there was just one count. But you have to ask hypothetically, well, would there have been grounds for a severance? Yes, there would have been. This court's Rule 14 jurisprudence, which we cite in the Rule 28J letter, says, when the jury might use the evidence of one of the crimes to infer a criminal disposition to evidence was hardly overwhelming against Mr. Martinez. Looking at each individual conspiracy, he mounted a vigorous defense. He testified in his own behalf. He offered a witness to support his defense regarding the first, and he had physical proof regarding the second, a magazine, and a signed statement by the telemarketers saying they would not commit fraud. So if there were two separate conspiracies, didn't your client engage in both of them? Well, that's what the government's evidence would argue. That's what the government's contending. But what I'm saying is, regardless of that, the issue for variance purposes, for Kodiakus purpose, is whether the government can prove beyond a reasonable doubt that the variance did not harm Mr. Martinez. And my point I'm making is, because you have to consider the court's joiner and severance jurisprudence, the question becomes, was he prejudiced by having those two separate conspiracy, complex conspiracy charges mushed together into one chart? That's what the Kodiakus analysis is all about. And this court's Rule 14 severance jurisprudence, which gets brought into the analysis, says you can't have two charges brought together when there's a danger of the jury finding criminal disposition of one or the other of the two. And that's precisely what we have here. If they would have been tried separately, as two separate conspiracy charges at two separate trials, Mr. Martinez would have had a much better shot of winning. But when you merge... Am I to assume that there was a motion to sever? Well, there wasn't, but you have to remember, that's what the government argues in its brief. This is not a severance motion issue on appeal. This is the strange thing about a Kodiakus analysis. It is an insufficiency of the evidence claim. That's how this has been developed over the decades. The severance issue only comes into play as part of the harm analysis, the prejudice analysis. So there was not a motion for severance because there was one count in the indictment alleging two different... Well, alleging one conspiracy. But once you got to trial, after Jeopardy attaches, you see that it's concerned with. And so the only severance issue relevance is whether he would have been entitled to a severance, hypothetically, had it been brought as two different counts. And he would have been under this court's jurisprudence. So there is a fatal variance that substantially prejudiced him. And I also want to point out, the government bears the burden of disproving substantial prejudice in this case. Alano and Kodiakus and Treft all say that. So the government should reverse count one. Let me talk now about the seven substantive counts. So these substantive counts, all alleged, they all had individual complaints who all testified. And they all testified that an unidentified telemarketer, verifier, customer service agent, they had various names, called them and they dealt with them on the telephone or through emails or whatever. But none of them were Mr. Martinez. None of them. There was no evidence that they dealt with Mr. Martinez. If he's going to be convicted of this and it's going to stand up on appeal, it's through aiding and abetting. The problem with that, though, is the government did not ask for a Pinkerton instruction. So they can't argue some sort of Pinkerton, fast sweeping Pinkerton liability. They're going to have to show aiding and abetting proof beyond a reasonable doubt. And under the Supreme Court's decision in Rosemont, they're not going to be able to do that. Rosemont says for aiding and abetting purposes, the government has to show the defendant's intent to aid and abet regarding each specific crime. What you got to remember is when these different complainants were contacted, if you believe the government's evidence, look, taking a light, most favorable to the government, you've got Mr. Martinez running one boiler room. You've got multiple boiler rooms. There's no proof the calls were made from anybody in his board. So what the government Rosemont wasn't a scheme offense, mail and wire fraud or scheme offenses. So my understanding of our laws, if you can prove that your client was involved in the scheme, then the aiding and abetting inquiry just turns into did he help further those crimes, those individual acts that were part of the scheme? Tell me what's wrong in that. Well, I would submit you're wrong in that because what Rosemont says is it says that the defendant has to intend to aid and abet individual specific crimes. Sure, there is some jurisprudence of this court before Rosemont that talks about once you join the scheme, you're responsible for whatever's part of the scheme. But that cannot possibly mean that any single telemarketer in a massive telemarketing operation is vicariously liable for every single thing every other telemarketer does at any point to a vast lengthy conspiracy that gets into that. That's the equivalent of Pinkerton liability. There is clearly a difference between Pinkerton liability and aiding and abetting liability. And the term that I'm really focusing on in Rosemont is they use the term specific crime. So there is no proof in this case that Mr Martinez aided and abetted any of these unidentified people regarding the specific complaints. Whether or not they can prove the scheme is not enough. They've also got to prove aiding and abetting and intent to aid and abet each of the actual acts of mailing or using the interstate wires. They can't begin to prove that in this case. So there is insufficient evidence as well of the subsequent briefly the sentencing issue. So the district court interpreted section 2326 as requiring a mandatory minimum consecutive sentence. In other words, the court treated it like a 924 C. Right. Let me ask you about that. We know about 924 C. We used to have some of those against each other. That is a five year minimum that gets stacked. What seems different here even is that there's no minimum here. I mean, the district court saw that it had to stack the sentences, but it could have imposed one day if it thought that was all that was warranted for this additional term. So I think this this segues into the government sort of argument about harmlessness. I mean, doesn't the fact that the judge gave six months when he doesn't have to show that he wanted to impose that six months, whether as a consecutive term or just on top of the underlying fraud count, which is how you're saying it should just expand the highest reach of the fraud counts. Correct. So you have to in analyzing harm here. And of course, the government has the burden of disproving that what I'm saying is true. When a court believes I've got this separate command from Congress that tells me to stack some extra time to punish the defendant for doing whatever the particular conduct is, one has to assume a district judge is going to think, well, that means something more than just one day typically. Right. What's the point of having a manman consecutive statute if it's just going to be one day? So the court, although he did say fair and just sentence, was proceeding under a completely different framework than simply saying the statute simply go from 30 to 35 years. We're not going to see a consecutive sentence. We're not going to see any extra time. Courts already think these guidelines are high enough. So here's the problem with it, with the court's interpretation. The government makes much ado out of the fact that the language 2326 says shall impose a sentence of imprisonment. Well, guess what? That's exactly the same language used in the mail fraud and the wire fraud statute section 1341 and 1343 and a bunch of other penal statutes in the federal code that don't have mandatory minimums that aren't consecutive. Use the word shall imprison or shall be sent. I don't think that's not the language that concerns me. It's that the language says it must impose a term up to five years in addition to any term for the underlying offense. I mean, doesn't a term up to five years in addition to this other I mean, doesn't that contemplate two terms? Not if you read the antecedent language shall be obviously the leading clause. If the antecedent language is shall be in prison and all it means is up to five years, the in addition to is just simply taking a zero to five and adding it on top of a zero to 30. I would refer this court also to for purposes of rural entity purposes. I would refer the court to the sentencing memorandum in U.S. versus Tomei, which we cite on page 47 foot note 40. That's the government speaking. The government has interpreted this statute in another 2326 case precisely as we are interpreting. At the very least, that's the rule of law. All right. Thank you, counsel. We'll hear from Mr. Warren's counsel and that's Mr. Norrell, I believe. Thank you, your honor, and may it please the court. My name is Josh Norrell and I represent Appellate Warrant and I'd like to be speaking to the reply point in Mr. Warren's reply brief specifically as to the issue that the district court erred in finding factual sufficiency for a three-level enhancement to Mr. Warren's sentence for his role in this offense and more specifically as a manager or supervisor. The court has the briefs before it, but what the court's going to note is that the district court did apply the seven factors from the note of the as to recruitment of accomplices, no as to claimed right to any larger share of fruits of the crime, and no as to any degree of control and authority exercised over others. The court did decide that the factor of the nature of participation in commission of the offense had been met and that the degree of participation in planning or organizing the offense had also been met and the court styled it that there was, quote, a big question mark as to decision-making authority. My client was the computer guy. He was the one who designed the database, the platform, and the IT. It's our position that the seven factors construing organizer, excuse me, manager or supervisor cannot be met. Mr. Warren is simply there to provide technical expertise. He did not recruit others. He exercised no control. Now with respect to control over property and assets, some of the key questions, and this is set forth in both appellant's brief and reply brief from the record, going to come down to a couple of key points of distinction. Did Mr. Warren have an ability to shut down the database? Did Mr. Warren have an ability to exercise control over the database to such a degree that it might have risen to the level to satisfy these seven factors? Our contention is not. That once again, what Mr. Warren did here is he designed a customized database that he had done previously as an independent businessman. And it had been done to support timeshare telemarketing businesses, but not to support any type of timeshare fraud, as was alleged in this case. And in fact, there was no testimony from the record in this case that Mr. Warren had set up the database to assist in fraud. The detailed notes are at the discretion of the end user of the database. Unfortunately, because Mr. Warren had created this database platform, it kind of puts him in a position where the government has argued that he was some kind of common entity or link bringing together the different actors in this. And our absolutely not accurate at what Mr. Warren did. General, a defendant's role in the offense is, correct me if I'm wrong, I think it's a factual finding that we review for clear error. Is that correct? Yes, sir. You can't reverse just because we disagree with what the district court found or just, you know, if we are looking at it afresh, might have decided it differently. So I'm trying to find exactly what the clear error was here. I mean, certainly your client played an integral role in kind of maintaining discretion and authority over the phone systems, correct? Well, Judge Willett, we would probably contend that that's not 100% accurate with respect to discretion and control over the phone system. He designed the databases, he did not have control of the ability to shut them down. He did not have, there's no evidence in this record that he had recordings or was actively involved in the management of those databases. This is a factual finding that in clear error is our standard on appeal, correct? Yes, your honor. Thank you. All right, we have your argument. Thank you, Your Honor. So, we have a case that we will be looking at today on behalf of the United States. Turning first to the variance issue, Martinez fails to show a variance, let alone one that affects his substantial rights, as he fails to show that viewing the evidence in the light most favorable to the government, no reasonable jury could have found a single conspiracy. This court considers three factors, the existence of a common goal, the nature of the scheme, and overlapping. Martinez concedes the second and third of those factors are satisfied here, and he disputes only the first factor, the existence of a common goal. Regarding that, there's ample evidence to show that there was a common goal between Martinez and his co-conspirators, including Chilson, Jenkins, Rosada, and Angelina Smith, both early in the conspiracy when they worked with Martinez, I mean with Mendez, and later when they continued the scheme at Martinez's company, RMS. They shared the common goal of deriving personal gain through a scheme to defraud timeshare owners. Now, Martinez argues that the common goal is not shown here because his company, RMS, competed with Mendez's company after the two men parted ways. But there are multiple problems with this argument. First, he's comparing the wrong entities. He claims that the two conspiracies are the earlier phase when he worked with Mendez, and the later phase when he branched off from Mendez. So, those two phases are what this court compares in determining whether or not there was common goal. Second, he relies on an inopposite authority. He cites a Second Circuit case addressing the double jeopardy issue, which is distinct and different from the variance issue, and he cites no variance authority supporting his argument. To the contrary, in variance cases where the co-conspirators arguably could have been competitors because they sold the same drug in the same area in Mitchell, or they ran the same scheme in the same geographic area in Beecham, this court has nonetheless still found the existence of a common goal. And even if the cited double jeopardy authority that he cites could apply to the variance context, Martinez cites no evidence that his company and Martinez's company competed after they parted ways. Under Martinez's own reading of Beecham, they collaborated. Martinez reads Beecham to say that after the original co-conspirators in that case parted ways and continued the scheme in their own separate companies, they nonetheless still collaborated. But he doesn't explain how they did so. If dividing customers up upon parting ways and continuing the scheme in your own respective companies counts as collaboration, then under this reasoning, Mendez and Martinez also collaborated because they too continued the scheme in their respective companies, and Martinez used the same customers from his time with Mendez in his RMS magazine. This court defines the common goal factor very broadly, and under its authority, it was clearly satisfied here. Because viewing the evidence in the light most favorable to the government, a reasonable jury could have easily found a single conspiracy beyond reasonable doubt. Martinez fails to show variance. Do you have to show the existence of a common goal? I mean, in other words, you said they've conceded factors two and three favor the government. Let's say we were to conclude factor one favored the defendant. Where does that leave us? It's then it's multiple conspiracies because you have to prove all three, or if they're mixed, what's the result? Well, there's no authority saying that any factor is dispositive. If you weigh them and you figure out, can a reasonable jury have found that there was a single conspiracy? And weighing them here, a reasonable jury easily could have found that there's a single conspiracy. So he can't show that there's a variance. Do you agree they were competitors in the later phases of the time period? I agree that they were both operating the scheme in the same area, but as far as whether or not they were competitors, there's no evidence to show that they were. In fact, the evidence suggests that they were just operating separately, but that a lot of these customers were schemed multiple times by multiple companies. So just because they had been scammed by one company doesn't mean that another company can go after the same victim. But even assuming variance, Martinez fails to show reversible error because he fails to show that it affected his substantial rights. Now, despite the fact that he argues that it's the government's burden to show prejudice here, under this court's precedent, it places the burden squarely on his shoulders. As this court held in Faulkner, where the indictment alleges a single conspiracy and the evidence establishes the defendant's participation in at least one conspiracy, the defendant's substantial rights are if the defendant can establish reversible error under general principles of joinder and severance. In Mitchell and in Richardson, this court has placed the burden on the defendant to show prejudice. Now, this can be understood as an aspect of variance law, where just like its cousin, joinder and severance, in those cases, the defendant bears the burden of showing prejudice, or it can also be understood as an exception to the general rule discussed in Faulkner, that where the government proves multiple conspiracies and the defendant's involvement in at least one of them, there is no variance affecting the defendant's substantial rights, unless in the exception recognized by Faulkner, the defendant can show reversible error under principles of joinder and severance. So the burden rests squarely on the defendant here in showing that he was prejudiced. And that burden is that he must show specific and compelling prejudice that resulted in an unfair trial, and from which the jury's instructions failed to protect him. This he cannot do. As this court indicated in Richardson and Simpson, a defendant cannot claim of prejudice from guilt transference, where he himself was involved in all of the conspiracies proved. And as this court held in Mitchell, any risk of prejudice was minimized by this court's instruction to the jury that it must acquit if it did not find that the defendant was guilty of the conspiracy charge, and guilty of some other conspiracy. Now, Martinez speculates that he was prejudiced because if he had been tried for only one of the conspiracies, he would have had, the jury may not have convicted him. But as this court held in Posada-Rios, a better chance of severance, and his mere speculation of a better shot of acquittal is based on a number of unfounded assumptions. Even if the conspiracy count had been severed into two counts, and even if those counts have been severed into two trials, he fails to show that the evidence of one conspiracy would have not come in as rule 404B evidence of his probative of his knowledge, intent, and planning in the trial of another. Indeed, knowledge was the main disputed issue at trial, as Martinez argued that he did not know that the companies he was involved in were running the heat pitch. As such, to the extent the juries considered a second conspiracy at all, they considered it only to determine Martinez's knowledge, which would have been permissible even in separate trials of separate counts. Moreover, even if you segregate the evidence and consider only the evidence regarding Martinez's involvement with Mendez at Resorts Condo Management and Timeshare Goldline, there was more than enough evidence to convict him of that conspiracy. Thus, the most likely result of the alleged error in charging him with purportedly two conspiracies in one count was that Martinez suffered only one conviction rather than two, and this hardly constitutes prejudice. Now, he points to Bermia and Fortinberry to argue that he was prejudiced. As an initial matter, it's questionable whether those cases apply to the variance context. There, in considering prejudice, the court looked at factors such as overlapping evidence, overlapping participants, and the nature of the offenses, and those reflect the same factors that this court considers to determine whether or not there was a variance in the first place. So, such a prejudice argument seems to cut against the argument there was a variance to begin with. But even if they do apply in the variance context, they offer him no help because he cannot show that the jury likely improperly used the evidence of one conspiracy to infer his criminal disposition to commit the other, because under Rule 404B, the jury is allowed to consider evidence of one conspiracy to find that Martinez had the knowledge required to commit the other, and given that knowledge was the primary issue disputed at trial, that is most likely what the jury did here, assuming it even considered a second conspiracy. So, he can't show harmlessness. He can't show reversible error, even assuming there was a betting issue. Martinez disputes only the prejudice prong of aid or in a better liability, arguing that there was no evidence that he acted in some affirmative manner to aid the offenses in Counts 2 through 8, but there was more than enough evidence for a reasonable jury to find that he acted in furtherance of those offenses. He helped obtain the merchant accounts that were used to charge each of the victims in Counts 2 through 8. He applied for the fictitious name Resorts Condo Management, which was given to the victims of Counts 2, 4, 5, and 6, and he notified the merchant account processor of the company's name change to Timeshare Gold Line, which was given to the victims in Counts 3, 7, and 8. These acts to help set up the business so that its workers could fool and charge each of the victims in Counts 2 through 8 was more than enough to support his conviction on those counts. What is it that the government has to show for aiding and abetting liability that's different than Pinkerton liability? Because, you know, Pinkerton, the guilt on the conspiracy, if there'd been a Pinkerton charge, would have allowed all these other accounts to fall like dominoes, basically. But there's no Pinkerton here, so it's aiding and abetting. What is different about just saying all these come in under aiding and abetting than would be under a Pinkerton theory? Well, Pinkerton applies liability from a conspiracy count, a separate count, to separate substantive counts. Wire fraud and mail fraud is unique in the sense that a conspiracy is an element of the wire fraud and mail fraud count of itself. You have to prove a scheme. So it's transferring liability from an element to the other element. So it's kind of like conspiracy, you prove a conspiracy, and the conspirators are then liable for the overt act. Similarly here, you prove a scheme, and the schemers are liable for the use of the mails or the use of the wires. So it's different. They're both based in agency law liability. In fact, Pinkerton derived its liability theory from mail fraud law. It cites mail fraud law for this agency principle and then applies it from one offense to another versus within offense, which is what Ader and Abetter liability, in the context of wire and mail fraud, operates similarly to Pinkerton, but it's different because it's within one offense. Since he provided the payment mechanisms, I mean, he would have aided and abetted every single fraudulent wire and mail, mailing that resulted from this scheme. Yes. That's all you think the established different counts. Yes. And setting up the scheme that allowed this whole thing to happen. He was critical in doing that. And that's what this court has held, and it's Moyla. They held that defendant responsible under aiding and abetting for getting the merchant accounts for those fraudulent businesses and getting the doing business names for those fraudulent businesses and held that person accountable for aiding and abetting without necessarily tying them to that particular thing. And Sanders as well for that defendant, because of her involvement and just establishing the culture of maximizing billings was held responsible in aiding and abetting for those particular healthcare fraud billings that were fraudulently done. So it's just like, it's the basic principle. Once membership in a scheme to defraud is established, a knowing participant is liable for any wire communication or mailing in connection with the scheme that has been applied by this court before. As far as the defendant's argument that there wasn't enough evidence, a jury reasonably could have found that he was a knowing participant from the beginning of this scheme, given that the merchant accounts were obtained under suspicious circumstances with him and Mendes flying to meet Hal Smith in Indiana, because Hal Smith refused to open these merchant accounts over the phone. Hal's requirement that they had to use a particular phone system, otherwise they couldn't get the accounts, improperly filled out paperwork that somehow managed to get approval despite the high-risk nature of the accounts, and a chargeback limit 20 times the industry standard. Based on this, a jury could have reasonably inferred that Martinez knew that those accounts were not meant for legitimate business. Also, given that Martinez was both the recipient of the merchant account statements and was a signatory on the company bank accounts, the jury could have found that he knew how much money that business was generating shortly after it started operating, and as Martinez himself testified, such large amounts of easy money evidenced the use of the heat pitch. Beyond that, you have his actions before the lockout, which show his knowledge of the scheme. He walked through rooms pitching heat sometime from July to December 2009, and that's Rosado's testimony. He received commissions on rooms pitching heat in the fall of 2009. He managed rooms where telemarketers used fake names in the fall of 2009. He knew the company was changing his name after only six months in business, and he instructed Chilson in January 2010 to make sure that the customers don't know that we were also resorts condo management. Before the lockout, he complained that he was not getting enough for sticking his neck out there with the heat pitch, and he assured room managers that everything, including the heat pitch, was going to be the same after his planned takeover, which indicates that he knew how things were running beforehand, and he also talked about introducing a magazine to cover their backs. Ultimately, after the lockout, he resolved his dispute with Mendez by expanding his sales team pitching heat and his share of the generated income. Based on this evidence, a reasonable jury could have easily found that Martinez understood the fraud scheme from the very beginning, and he grew increasingly uncomfortable, not with the fraud, but with his share of the profits. Because a reasonable jury could have easily found that Martinez was knowingly interrupting. Pam, we don't have Judge Costa on the screen. Yeah, I just noticed that he has he left the meeting, and I think they're trying to, the IT people are trying to reach out to him to come back on, so we have to see if that's, if it's a problem. We're working on it. Just give me one second. Should I pause? You want to pause the clock there, Pam? Yes, sorry, thank you. All right, I'm back. Sorry, we're at that. For the record, Judge Costa, I wanted to wait for you. Judge Weiner wanted to plow ahead without. Well, I think this just proves how, you know, I'm not needed at all, because I'm sure things went smoothly. Where were you, Ms. Hayworth? I can listen to anything you said while I was gone. I can listen later, so you don't have to repeat it. I'm just, I'm not sure where you dropped off, but I had just finished the aiding and abetting part. Okay, that's where I was. Okay, all right, so my apologies, but you can continue then wherever you want to go next. Okay, because Martinez does not address the in-furtherance requirement in his reply or oral argument, I will rest on our briefs on that unless the court has any questions. Similarly, with the hearsay argument, because Martinez nor Warren addressed that, I will rest on our brief unless the court has any questions about the hearsay argument. I have one question for you since you've still got time. If we were to find that Martinez was involved in not one but two separate conspiracies, what's the best argument that this would not affect Martinez's substantial rights? On the hearsay issue or? Yeah, on the issue of one or two conspiracies, and if it was found two, but there were only one. That would be the variance that there was no prejudice because under Richardson and Simpson, if he was involved in two conspiracies, there can be no prejudice from transference of guilt. And even if we assume that it was charged in two counts in two trials, one evidence of one so he can't show any prejudice from that. The most likely result would have been he had two convictions as opposed to one. And that would not affect his substantial rights? No. If anything, it helped him. Okay, so turning to section 2326, the enhancement. Both defendants failed to show the district court erred in its interpretation of that statute as its interpretation is consistent both with the statutory language and with this court's decision in Guerrero. First by its plain terms, section 2326 provides for the imposition of a consecutive sentence. Specifically, it provides that a person convicted of wire or mail fraud or conspiracy to commit the same in connection with the conduct of telemarketing shall be imprisoned for a term of up to five years in addition to any term of imprisonment imposed on the underlying fraud offense. This language clearly calls for the imposition of a consecutive term of imprisonment. Second, the district court's reading of the statute is consistent with this court's decision in Guerrero, which held that section 2326 mandates an additional sentence, and it affirmed the 36-month consecutive sentence imposed under it. Now, despite the plain language of the statute and despite this court's decision in Guerrero, Martinez and Morris contend that section 2326 does not require the imposition of a consecutive sentence. It merely increases the statutory maximum sentence available under the underlying penal statute. But section 2326 language is notably different from statutes that raise the statutory maximum, and it most closely resembles statutes like section 3147, which provide for a consecutive sentence. Defendants contend that it cannot provide for a consecutive sentence under their reasoning because only a statute that sets out a whole separate offense, as opposed to merely an additional element, can authorize a consecutive sentence. But the defendants cite no authority for that proposition, and this court has recognized that a similar statute, section 3147, which is not a separate offense, nonetheless provides for an additional consecutive term of imprisonment. In his reply, Martinez also contends that at a minimum, there is no serious ambiguity, there is a serious ambiguity about whether section 2326 requires or merely allows an enhanced sentence. But the statute directs that a person shall be imprisoned for a term in addition to any term of imprisonment imposed under the mail and wire fraud statutes. He fails to show how the statute's use of the term mandatory is ambiguous. He refers to other, the wire fraud statute as using shall, but even in this case, shall means shall. And I assume he's saying that it doesn't because the court can impose probation in certain circumstances, assuming he's borrowing the argument from the Tomee brief in that case. But here, the court doesn't even have discretion to impose probation because the sentence was at least 30 years, given the financial institution requirement. Well, let me ask you about the enhancement for Warren. Tell me which conspirators Warren managed or supervised. The, he didn't manage a conspirator, but the enhancement applies where a person, where the defendant exercises management authority over the property or activities of the criminal organization. I didn't see that the district court relied on the property aspect. Where in the record is it? Because the district court, there's big debates about the four-point enhancement. And it goes, the district court goes to all the factors and says, no, it's not enough to get the four-point enhancement. But then basically after thoroughly going through those factors says, but I'll give the three. And so all the discussion with the four-point, as I read, it was about managing or supervising people. Where do you think that the district court found it based on management of property? It was, there was a lot of discussion about his control over the databases and what he could do about it. So that would be the property. But it was mainly the criminal activities as he assisted in hiding the true identities of the addresses with purported out-of-state addresses and the phone numbers that match the company's purported out-of-state addresses. He also provided advice to co-conspirators on how to transition to new company names without raising customer suspicion. And he assured co-conspirators that he could erase information should authorities ever come looking. So you're agreeing he didn't, he didn't manage or supervise people. You're saying it's just based, it was warranted based on managing property or the criminal activities. Managing the activity of switching names to name, managing the activity of hiding the identity of the company by enlisting Wessel's company. And I know all that, but I mean, I'm looking at 3B1.1. It says if the defendant was a manager or supervisor, and then, and it involved five or more participants, then you go to the note, note two to qualify for an adjustment. The defendant must have been the organizer, leader, manager or supervisor of one or more other participants. Then it goes on to say an upward departure, not the actual enhancement here, might be warranted if the person oversees the property. So I know we have some case law maybe breathing otherwise, but I mean, just, just looking at the guideline, how do you get an enhancement for when you don't manage people? Right. Delgado has interpreted that guideline to apply when you manage property and activity. So under this court's precedent, it applies when you manage property or activities. And this, what the judge did here too, could also be interpreted as he found that Warren, what he did was warranted some kind of adjustment and could be buried down because he didn't think that the government had necessarily proved he was a leader. He wasn't yet a leader, but he was way more than a rank and file. And he was critical to this scheme. Do you have in your fingertips there, Ms. Hayworth, the record sites for that management and supervision of property, that laundry list you were ticking off there? In Delgado? No, no. You were going through the various ways in which Mr. Warren managed or supervised the property. And do you have those kind of record sites at your fingertips? Yes. So he assisted in hiding the true nominee and mail forwarding services from Kevin Wessel's company to make the company look like it was out of state with different, that Martinez and Mendez's names were not on the company documents. And that's ROA 2745, 2780, and Government Exhibit 21. It's also ROA 3996 to 4005. Regarding the mail forwarding addresses that he got for the company, that's ROA 2407 to 08, 2417 to 20, Government Exhibit 28, ROA 1860, ROA 1306. The phone numbers that he got for the company is ROA 1308 to 09, 1386, Government Exhibit 2256, and ROA 1447. I can look it up afterwards if you don't know offhand, but did the pre-sentence report recommend an enhancement based on this property theory or based on supervision of people? I mean, it recommended the plus four, but I'm just asking, but was that based on oversight of people or property? And if you don't know, I can look it up afterwards. I don't know off the top of my head. I just know that they felt like he was a leader based on his being a gatekeeper for Hal Smith merchant accounts and for him receiving proceeds from the scheme. It didn't really go through managing things. It went more like these are the qualities that make him a leader under the note four. Right. But just being essential, I saw some talk of that as, oh, he was essential because he provided these phones and everything. I mean, would you say the getaway driver in a bank robbery who's essential, but he be a manager supervisor? Probably not. But Warren's participation was not limited to just providing a database and phones. He went way beyond that. I mean, he was the one they had to use his phones to get Hal Smith merchant accounts, which were extremely valuable because they provided a chargeback limit 20 times that of normal processors. He was critical in hiding the true identities of the company, and he advised them on how to transition to new names without raising customer suspicions. He played a much bigger role than just a getaway driver. All right. You can wrap up. At the very least, it wasn't implausible for the district court to find so. And that's all that this court needs to affirm. His role is more similar to Delgado, where the defendant exercised responsibility over the property and activities of the criminal organization by making arrangements for transportation. More similar to Valdez, where the defendant made technical decisions about concealing drugs and planned the route they should be taken. Similar to Butler, where he provided a critical link between the co-conspirators. All right. We have your argument. Thank you, counsel. We'll hear a rebuttal. First, Mr Newton. Um, so I want to address the issue of the factors for deciding whether they're one or two conspiracies. I have never seen a case that says the factors are disjunctive. I've never seen a case that says the factors are simply you weigh them. You see various tests in the law where there are various factors and you weigh them. None are dispositive. These are clearly conjunctive factors. If one is missing, the table falls down. Um, and they did not have a common goal. Use the government's words in their brief. They slipped in mid 2010 around June. They were clearly competitors. There were competitors just as as Apple and Dell were competitors. You don't have to necessarily prove they called themselves competitors. They were competing for a limited number of customers to call just with a bunch of other telemarketing fraud companies around Orlando and other places. So to say they're not competitors is just not supportive of the record. They were competitors. And for that reason, they didn't share a common goal. I also want to point out that the double jeopardy jurisprudence is informative here, because logically, how could you have two conspiracy counts that are not the same offense for double jeopardy purposes, but also mush them together and not call it a variance? That just doesn't make any sense. They're either separate offenses for both purposes or they're not. And these could not, these could have been brought as count one and count two. Of course, get to the severance issue, but they could have been brought as count one and count two without violating the double jeopardy clause. They are different conspiracies. That's the point. Um, so I want to talk now about the harm issue, the prejudice issue. So there is some language in some Fifth Circuit cases in passing that says burden on the defendant. Well, it doesn't really say burden on the defendant, it just speaks in that manner. But I'm going to rely on Supreme Court case law here. If you look carefully, and this is pointed out in the reply brief, if you look at Olano and you look at Kodiakos, what you see is that Rule 52A, which is discussed, or the statutory predecessor to Rule 52A, used to be in a statute. That provision is precisely the one cited by the Supreme Court in Kodiakos in discussing the prejudice issue. Well, Rule 52 in Olano, the Supreme Court explicitly says, decades after Kodiakos, of course, where the issue was first, you know, discussed, but they say Rule 52A, burden on the government. So if you combine the Kodiakos reliance on the statutory predecessor of Rule 52A with Olano, which says Rule 52A, burden on government, that puts the burden on the government. There's no other way to view it under binding Supreme Court precedent. This court's decision and draft, and some other cases, says when there's a constitutional issue going on, it's burden of proof beyond a reasonable doubt. Because a fatal variance is a sufficiency of the evidence issue, it is necessarily a due process constitutional issue. So it doesn't take a leap of logic here to say the government has the burden to prove beyond a reasonable doubt that Mr. Martinez was not substantially prejudiced at the trial as a result of the variance. I'm relying on Supreme Court authority for that proposition, not some other circuit, Supreme Court authority. In terms of the aiding and abetting, the innocent behavior, according to Mendez, that Mr. Martinez was doing was innocent. Mr. Martinez testified without contradiction. When he set up his operation, when they got the merchant account and all these other things that Mr. Martinez lent his name and credit to, it was not illegal. It didn't become illegal until mid-2009. So that stuff cannot be relied upon to prove Mr. Martinez's guilt through an aiding and abetting theory. Mr. Martinez, if the government's going to prove it, they got to prove it based on him running one of the boiler rooms, and the evidence simply does not support that. All right. Thank you, counsel. And last, we'll hear Mr. Norell, your rebuttal. Thank you, Judge Costa. To briefly reply to a couple of points of analysis that the court was asking about previously. First of all, I would point the court's attention to page seven of Appellant Warren's reply, where we pointed out that this current case, at least in the aspect of controller, manager, supervisor over people, there's going to be no evidence of that in this case. And what the court was asking about was the streamline of analysis with regards to property or assets. On page 33, that's 33 of Appellant's brief, the district court, we noted that the district court expressly concluded that the seven factors from note four only applied when determining if there was enough evidence to show an organizer or leadership role, not when determining managerial or supervisory role. The government reiterated that in its response brief. However, I'd like to point the court's attention to a case from this court, United States v. Tovar, 558 Federal Appendix 442 from 2014, where this court cites its own previous opinions in United States v. Reagan, as well as other circuits, including the Fourth Circuit, the Eighth Circuit, all citing, quote, our circuit and others have also frequently used these factors to determine whether a participant in a criminal activity exercised a managerial or supervisory role or lesser role. And that's been Appellant Warren's position on this, is that plausible when taken as a whole from the record, this record is going to be void of certainly control over others, and we also contend that it's insufficient with respect to control over property or assets. Thank you. All right, thank you, counsel. I see you are court appointed, so we thank you for for taking that appointment and ably representing your client. With that, this case is submitted and counsel are excused.